2020 IL App (1st) 172187-U

FIFTH DIVISION
September 30, 2020

No. 1-17-2187

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | No. 14 CR 4928 |
| JEMAL ROSS, | ) ) | |
| Defendant-Appellant. | ) ) | Honorable Erica L. Reddick, Judge, presiding. |

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justices Hoffman and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The State's closing argument did not deny defendant a fair trial. Defendant's trial counsel did not render ineffective assistance. Affirmed.

¶ 2    Following a jury trial, defendant Jemal Ross was convicted of first degree murder and sentenced to 38 years in prison. Defendant appeals, contending that (1) the State's closing argument denied him a fair trial, and (2) trial counsel rendered ineffective assistance. We affirm.

¶ 3                                    BACKGROUND

¶ 4      The State charged defendant with multiple counts of first degree murder and mob action in connection with the shooting death of Andre Hughes.[1]  The first degree murder counts alleged various theories, including intentional, knowing, and felony murder predicated upon mob action. Defendant was tried simultaneously with codefendant James Dixon but before separate juries. Because the issues presented in this appeal concern five trial witnesses who all recanted prior statements implicating the defendant, and a non-charged witness who confessed to the crime from the witness stand, we set forth the evidence in detail. At trial, Chicago police officer David Watson testified that, at around 9 p.m. on February 13, 2014, he and his partner, Tom Sweeney, received a call of shots fired in the 300 block of North Central Avenue.  When they arrived at the alley behind the building located at 312 North Central, Watson saw a black male lying motionless in blood-spattered snow with spent shell casings nearby.

¶ 5      Watson called out to bystanders in a stairwell and behind a gate, asking if anyone could explain what happened.  The only response he heard was, "They f***ed him up."  Watson stated that no one was forthcoming or cooperative, no one explained what transpired, and no one provided their names or contact numbers.

¶ 6      Chicago police detective John Valkner testified that he arrived at the scene at around 9:15 p.m. and began canvassing the building.  He learned that a woman in apartment 107, Darneshia Grissett, had borrowed a bucket from her neighbor across the hall.  Valkner identified the consent

---

[1]  The State nol-prossed the mob action counts before trial.

form that Darneshia[2] signed allowing a search of her residence. Police recovered a mop with apparent blood on it and a bucket. Darneshia agreed to go to the police station for questioning.

¶ 7    At the police station, Darneshia identified Allen Ford (whom she also knew as "Awall") and codefendant (whom she also knew as "Shorty Drill" and "Lil James") as individuals who were "stomping" on the victim. Darneshia stated that codefendant held a door open while Ford dragged the victim out of the building by the back steps. Valkner brought Darneshia back to the police station for a second interview after he viewed the surveillance footage of the building and after he informed her that he had spoken to other witnesses. At that point, Darneshia admitted that it was defendant (whom she also knew as "Bolo") who was kicking, "stomping," and punching the unconscious victim on the ground.

¶ 8    Valkner further testified that Jesse Little identified defendant and codefendant as the individuals who beat, punched, and stomped on the victim. Valkner added that Little and Terrell Jackson both identified defendant at a physical line-up as one of the men who beat the victim in the hallway. According to Valkner, Little said that Glen Grissett was also present during the beating of the victim and identified Glen's photograph from a photo array.

¶ 9    Chicago police detective John Campbell testified that he interviewed Glen at around 2 a.m. on February 14, 2014. Campbell stated that Glen identified defendant and codefendant as the individuals who were "beating and stomping" on the victim. In addition, Glen identified codefendant as the individual who "pulled out a gun in [the] hallway."

¶ 10    Campbell arrested defendant at around 11 p.m. on February 15, 2014. Campbell and his partner, Detective Marszalec, brought defendant to the police station for questioning. Campbell

---

[2] Because both Darneshia Grissett and Glen Grissett testified, we refer to them by their first names.

sat in the back with defendant, while Marszalec drove. While en route, Campbell said that defendant was very upset and kept asking why he was under arrest. Campbell then advised defendant of his *Miranda* rights and informed him that they were investigating the victim's murder. When defendant claimed he was not present at the time of the offense, Campbell told defendant that there were witnesses and a video recording refuting that. Defendant eventually admitted that he was there but that he was afraid of codefendant. Defendant saw codefendant shoot the victim with a small chrome handgun. Defendant was standing at the back door to the building keeping it open so that the door would not close and automatically lock them out. When they arrived at the station, they placed defendant in an interview room. His interview was video recorded; portions of the recording were played for the jury. Campbell further testified that he obtained a video recording of the surveillance camera at Prestige Liquors, which "showed [] defendant and the victim in the liquor store." That surveillance video was also then played for the jury.

¶ 11 On cross-examination, Campbell conceded that, while transporting defendant to the police station, defendant never stated that he had dragged the victim down the hallway or punched the victim. Campbell agreed that defendant made those admissions only after speaking with Detective Egan. On redirect examination, Campbell stated that he heard defendant use profanity "repeatedly," but on recross-examination, Campbell admitted that defendant's use of profanity was not directed at the interviewing officers.

¶ 12 Chicago police detective Vincent Alonzo testified that, on February 16, 2014, he interviewed Terrell Jackson (also known as "TBaby" [*sic*]) at the police station. According to Alonzo, Jackson admitted "hearing a ruckus" and seeing the victim fall down the stairs to the floor. Jackson identified defendant in a photo array and a lineup as the individual who kicked and

punched the victim. Alonzo further stated that Jackson did not indicate that Glen was present at the time of the offense.

¶ 13    Chicago police sergeant Russell Egan then testified that he was assigned as the lead detective in this incident. Egan stated that, although Darneshia initially stated that "SD [codefendant] and Awall" beat the victim in the hallway, she later stated that it was codefendant and defendant who beat the victim in the hallway outside of her apartment and then dragged the victim down the hallway. According to Egan, Darneshia had lied during her first interview because she had been "intimate" with defendant and was lying to protect him.

¶ 14    Egan further stated that both Glen and Jackson identified defendant as beating the victim in the hallway, and that Haymon identified defendant and codefendant in a photo array and wrote "hitting vict [*sic*]" on each photograph. Egan added that Little also identified defendant and codefendant as the individuals who were at Prestige Liquors and who beat the victim. Egan confirmed that Glen stated that codefendant took out a chrome handgun in his right hand before putting it back and dragging the victim down the hallway with defendant.

¶ 15    Egan admitted that, while interrogating defendant, he kicked the mat that defendant had been provided for sleeping. The following exchanges then took place:

> "Q. Did you use profanity with Jemal Ross?
>
> A. I did.
>
> Q. Why did you?
>
> A. Because in the context and the vernacular Jemal was using, I was using some of the same words to, you know, keep him focused and make sure he understood what I was talking about."

Egan further confirmed that defendant used profanity during questioning. On cross-examination, however, Egan conceded that defendant did not direct any profanity toward police personnel.

¶ 16    During Egan's testimony, portions of the DVD recording of defendant's interview were played for the jury. In the recording, defendant admitted hitting the victim "one time" but denied stomping on or dragging the victim down the hallway. Defendant said he was reluctant to describe what happened because "snitches get stitches," which defendant explained meant that people who provide information to the police frequently suffer violent reprisals. In the recording, Egan also loudly tells defendant, "[Y]ou're lying like a little baby, like a little bitch."

¶ 17    On redirect examination, Egan agreed that when he was questioning defendant, he was aware that four witnesses—Glen, Darneshia, Jackson, and Little—said that they saw defendant beating, kicking, stomping, and then dragging the victim. The following then occurred:

> "Q.   Is it fair to say [defendant] took full advantage of speaking to the police?
>
> A.  He did.
>
> Q.  But that he wasn't truthful about what happened?
>
> A.  No, he was not totally truthful about the event that took [the victim's] life.
>
> Q.  And based on the statements of the four witnesses, there was enough to go forward on a case against Jemal Ross?
>
> A.  There was.
>
> Q.  So when you say to him, hey, Jemal, you got to come up with a better story, you're indicating to him that you do not understand or believe what he's telling you is the truth?

A. That's what I was saying in that form of statement, yes."

Egan further confirmed that, when he told defendant to "come up with a better story," he was communicating to defendant that Egan did not believe defendant's account.

¶ 18    Cook County Assistant State's Attorney Suzi Collins testified that she interviewed and took the video recorded statements of Glen, Darneshia, and Little. Collins said she asked all three witnesses how the police treated them. Collins believed that Glen told her he had been treated well, and Collins recalled that Darneshia agreed that the police had been respectful to her and that Little said he was treated "[f]ine." Collins added that Little did not appear to be under the influence of alcohol or drugs at the time of his interview or statement.

¶ 19    The witnesses' video recorded statements were then played for the jury, a summary of which follows. Darneshia was "pretty sure" defendant and codefendant were members of the Four Corner Hustlers gang. Glen confirmed that defendant and codefendant were Four Corner Hustlers; Little also agreed that defendant was a Four Corner Hustler.

¶ 20    On the day of the shooting, Little went to Prestige Liquors with defendant. While they were there, Little heard the victim say "something" about the Gangster Disciples gang. According to Little, defendant took the victim's statements personally and told the victim to "take that GD [Gangster Disciples] shit back" to where the victim came from.

¶ 21    Little said that, when they returned to the building, defendant told others in the hallway what the victim had said. Glen recalled that defendant heard the victim say "F*** the Fours" at the liquor store. Glen stated that codefendant and defendant stopped the victim on the stairs, and Glen saw that codefendant had a gun.

¶ 22    Darneshia and Little saw defendant and codefendant stomping on the victim. Little added that they were also punching the victim. Darneshia said she saw defendant dragging the victim

toward the back door. Glen stated that codefendant punched the victim, defendant kicked the victim in the head repeatedly, and both defendant and codefendant dragged the victim to the back door. Glen and Little both then left and heard gunshots coming from the back of the building.

¶ 23    Darneshia and Glen both stated that the police had treated them either "okay" or "well," and the police had not threatened them or promised anything to induce their statements. Little stated that he was not under the influence of drugs or alcohol on the night the victim was killed.

¶ 24    Cook County Assistant State's Attorney Patrick Waller testified that he took the written statement of 16-year-old Demetrius Haymon. Waller stated that, during his conversation with Haymon, he learned "early on" that Haymon was a minor, and Waller discussed "the situation with his Mom not being there." Haymon then used his cell phone to call his mother and explained to her what was happening. Waller said he then spoke to Haymon's mother, explained "what was going on at the police station," and asked for her permission to take Haymon's written statement. After his conversation with Haymon's mother, Waller took Haymon's statement.

¶ 25    Waller recounted that Haymon told him that the police treated him well, and Haymon's statement was published to the jury. Haymon's statement indicated that he witnessed a fight that started after words were exchanged between defendant, codefendant, and the victim (whom Haymon did not know). Both defendant and codefendant were members of the Four Corner Hustlers gang, and the victim (who was a "GD") insulted the Four Corner Hustlers. Haymon then saw someone throw the victim to the ground, and various people, including defendant, started punching and kicking the victim. The victim did not fight back and was "very badly" beaten. The beating stopped, and then defendant dragged the victim away, at which point Haymon left the building. Finally, Haymon said detectives and ASA Waller treated him well, and he gave his statement freely and voluntarily and not because of any threats or promises.

¶ 26    Cook County Assistant State's Attorney Anastasia Harper testified that she took the grand jury testimony of Glen, Darneshia, Jackson, and Little. Harper stated that, when she asked Glen and Little how they were treated by police, they each responded, "Fine." Harper further said that Little did not appear to be intoxicated or otherwise impaired at the time of his grand jury testimony.

¶ 27    The transcripts of Glen's, Darneshia's, and Little's grand jury testimony were published to the jury, and their statements were substantially the same as their statements to the assistant state's attorneys. Jackson's grand jury testimony indicated that defendant, codefendant, Glen, and others were in the apartment building hallway shortly before the victim's death. At some point, Jackson, who was standing in the doorway of apartment "E," saw the victim "com[e] down the stairs and hit his face on the floor." Jackson stated that he did not see what caused the victim to fall down the stairs. Afterwards, Jackson went back into his apartment but later spoke with a detective named Gilger. Jackson identified defendant in a lineup at the police station and in a photo before the grand jury. Jackson also testified to the grand jury that Detective Gilger treated him "okay" and that Gilger did not make any threats or promises to induce Jackson to speak with him, and Jackson spoke with him freely and voluntarily.

¶ 28    Little's grand jury testimony included statements that Collins treated him "good" and did not threaten him or promise him anything to get him to speak with her. Little added that he was not under the influence of alcohol or drugs when he spoke to Collins and spoke freely and voluntarily. Finally, Little confirmed that he agreed to have his statement video recorded and answered the questions truthfully.

¶ 29    In response to Harper's question before the grand jury, Darneshia said that officers treated her "all right, but I felt like I was harassed a little bit." Specifically, Darneshia complained that the police locked her out of her house, did not have a search warrant, and questioned her 4-year-

old son. When asked whether anyone threatened or promised her to get her to talk to them, she responded that "they said something about witness protection" because she was frightened by what she had seen, but she did not pursue it further. Darneshia further said that she was treated "fair" by the assistant state's attorney and the detective when she made her recorded statement, and added that no one threatened or promised anything to get her to make her statement.

¶ 30　At trial, Darneshia, Glen, Little, Jackson, and Haymon all recanted their prior statements inculpating defendant that they made to the police, the assistant state's attorneys, and the grand jury. At some point, all of them either denied or could not recall seeing defendant beat and then drag the victim down the hallway of the building.

¶ 31　Darneshia initially testified at trial that she saw defendant, codefendant, and others (including her son, Glen) stomping on the victim, and that she saw defendant and codefendant then drag the victim to the back exit of the building. She later testified, however, that she did *not* see defendant stomping or dragging the victim and added that she did not see anything that she had earlier testified to. Darneshia stated that she had been threatened with jail and that she would lose custody of her children if she did not testify. On cross-examination, Darneshia stated that she saw her son, Glen, stomping on the victim but did not tell the police because she was trying to protect "everybody." When asked whether Darneshia agreed that she protected defendant because he was her boyfriend, but when asked whether she protected Glen "mostly because he is your son," she responded, "Not really."

¶ 32　Glen testified that, at the time of trial, he was in custody on an unrelated matter and had a prior January 2015 felony conviction for possession of a controlled substance. At the time of the offense, he was at the building with his best friend "Nino," but he did not know Nino's real name. Instead, Glen stated at trial that it was he and Nino who beat the victim, dragged him down the

10

hallway and outside the building, and that Nino had shot the victim. Glen stated that he did not tell Collins that Nino shot the victim because Nino was his best friend. Glen further testified that he implicated defendant because he was upset that defendant was dating his mother, Darneshia. Glen admitted that the testimony of police officers, video recordings of his statements to Collins, and the transcript of his grand jury testimony were accurate, but he nonetheless denied the veracity of substantially all of those statements.

¶ 33    Little testified that he was currently in custody for failure to appear in court under subpoena, and he stated that he did not want to testify in this matter. Little did not recall seeing defendant or codefendant on the night of the victim's murder, nor did he remember the events leading up to the murder. Little added that he did not know the names of either defendant or codefendant. On cross-examination, Little stated that he was unable to remember because he had smoked PCP-laced marijuana and drunk a fifth of Hennessy (cognac) and a half of a pint of tequila.

¶ 34    Jackson also testified that he was currently in custody for failure to appear in court under subpoena. He further conceded that he had prior convictions for possession of a controlled substance (in 2014), delivery of a controlled substance (2012), and robbery (2010). Jackson stated that he only agreed to view a lineup because the police "badgered" him, used "very vulgar" language with him, and threatened him, including informing Jackson that the police would "put [him] into the case," *i.e.*, frame him for the offense. Jackson added that a detective called Jackson a "bitch," tried to put his hands on Jackson, and kicked "stuff" around. Jackson further stated that he did not know defendant's real name until the police informed him of it at the lineup. When the State showed Jackson a photograph of a lineup, Jackson recognized the photograph and admitted that defendant was one of the individuals depicted in the lineup.

11

¶ 35    Haymon testified that, at the time of trial, he was 19 years old and in custody for an aggravated unlawful use of a weapon conviction. Haymon admitted writing "hitting vict" on a picture of codefendant and defendant but explained that, although he kept telling the police that he was not there, the police kept "yelling at him," so he told them "anything" because he "just wanted to get out of there." Haymon did not recall speaking to Waller and claimed he did not have a cell phone with him to speak to his mother.

¶ 36                                    Closing Arguments

¶ 37    After the close of the evidence, the court admonished the jurors that closing arguments were not evidence and that they should disregard any argument that is not based on the evidence.

¶ 38    During its initial closing argument, the State argued that the witnesses' video recorded statements were more credible than their courtroom testimony, stating:

> "You saw in the video, and I ask that you take a look at each
>
> of those clips that we went through when you were here earlier; and
>
> you can see exactly who's hanging out in that building.
>
> And those are our witnesses; and what you need to consider
>
> is, what is going on in their mind, as they are testifying.
>
> First of all, they're the Defendant's friends and his gang
>
> members; and what did Bolo [defendant] tell you in his statement?
>
> He said at least twice, that snitches get stitches. Meaning if
>
> you cooperate with the police, you could get hurt.
>
>                                 * * *
>
> Glen Grissett, have any of you seen the movie New Jack
>
> City? No?

Because I—his testimony had no credibility; but back when he wasn't looking at his friend over there, he told the Assistant State's Attorney, at the videotaped statement, as well as the Grand Jury, exactly what happened.

And *** the photo array, when he identified Bolo, the defendant, what did he write? [']Kick in face.[']

That was on the early morning hours of February 14, when Andre had barely been deceased."

¶ 39 The State further argued that the jury should disregard Glen's in-court confession to the murder. In particular, the State made the following comments:

"You also know that Glen Grissett was in custody on an unrelated matter. He's got nothing to lose but to come in and to protect his friends, and that's exactly what you saw."

¶ 40 During defendant's closing argument, defense counsel stated that the prior statements of Darneshia, Glen, Little, and Jackson were not "worth the paper that [they were] written on [or] the video that [they were] recorded on." Defense counsel added that the testimony of the prosecutors and police officers was merely "this is what I was told." Counsel further noted that the witnesses testified that their prior statements were the result of police pressure or because they were "high."

¶ 41 During its rebuttal argument, the State commented on Glen's confession again, saying, "Fantastic story about Glen Grissett, how he got involved. Nobody else puts Glen Grissett in this at all. They come up with this fictitious character, Nino, from a movie back in the '90s. It's a slang term." The State also argued that defendant picked the witnesses "because he knew them; and he could either intimidate them; or they were his friends; and they would stand up for him."

¶ 42    Finally, when discussing the credibility of its witnesses' pretrial statements, the State made the following comments:

> "Grand Jury testimony, you saw Anastasia Harper. You saw Patrick Waller. You saw Suzi Collins from the State's Attorney's Office. They explained how they did things.
>
> They spoke to each witness alone, to find out how they had been treated by the police. They did that to ensure what they knew the witness was willing to tell them, one-on-one, without anybody else around.
>
> And when they were confident of them—of that, they were placed in front of a video camera, did a handwritten statement, or appeared in front of the Grand Jury.
>
> The Grand Jury, they're alone with the ASA [assistant State's Attorney] in front of the Grand Jurors, under oath, corroborated by video."

¶ 43    Following closing arguments, the trial court instructed the jury that (1) the attorneys make closing arguments to discuss the facts and circumstances in the case, and the arguments should be confined to the evidence and to the reasonable inferences from the evidence; (2) neither opening statements nor closing arguments are evidence; and (3) they should disregard any statement or argument not based on the evidence. The jury found defendant guilty of three counts of first degree murder and that defendant was armed with a firearm during the commission of the offense. The circuit court sentenced defendant to 38 years' imprisonment. This appeal follows.

14

¶ 44                                          ANALYSIS

¶ 45                          The State's Closing Argument

¶ 46    Defendant first contends that he was denied a fair trial based upon the State's misconduct during closing arguments.  Specifically, defendant argues that the State improperly:  (1) implied that Glen had nothing to lose by confessing because he was serving a long prison sentence, (2) argued that witness recantations were the result of intimidation by defendant, even though no evidence of such intimidation was presented, (3) argued that Glen's assertion that "Nino" was the actual shooter was fabricated from a "90s movie and a slang term" despite there being no evidence to support that claim, and (4) "vouched for the truthfulness of witnesses" by stating that other prosecutors were confident in the occurrence witnesses' pretrial statements.  Defendant acknowledges that none of these claims were raised at trial or in a post-trial motion and are therefore forfeited.  See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988).  Defendant, however, asks that we review this issue under the plain error doctrine, or alternatively, asserts that trial counsel was ineffective for failing to lodge an objection.

¶ 47    The plain error rule bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either:  (1) the evidence is close, regardless of the seriousness of the error; or (2) the error is serious, regardless of the closeness of the evidence.  *People v. Herron*, 215 Ill. 2d 167, 185-87 (2005).  In the first instance, the defendant must prove "prejudicial error." *Id.* at 187.  By contrast, in the second instance, prejudice to the defendant is presumed because of the importance of the right involved, regardless of the strength of the evidence.  *Id.*  In the latter situation, the defendant must prove that "there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial

process." *Id.* However, before considering whether the plain-error exception applies, we must first determine whether any error occurred. *Id.*

¶ 48 Claims of ineffective assistance of counsel are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by the supreme court in *People v. Albanese*, 104 Ill. 2d 504 (1984). *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010). To establish ineffective assistance, a defendant must show both that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant. *Id.* (citing *Strickland*, 466 U.S. at 687). Deficient performance is performance that is objectively unreasonable under prevailing professional norms, and prejudice is found where there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 496-97; *Strickland*, 466 U.S. at 690, 694. The failure to establish either prong of the *Strickland* test is fatal to the claim. *People v. Clendenin*, 238 Ill. 2d 302, 317-18 (2010) (citing *Strickland*, 466 U.S. at 697).

¶ 49 The State is given considerable latitude in making closing arguments, and it may respond to comments that clearly invite a response. *People v. Hall*, 194 Ill. 2d 305, 346 (2000). Furthermore, we must review the arguments of both the State and the defense in their entirety, with the challenged portions placed in their proper context. *People v. Cisewski*, 118 Ill. 2d 163, 175-76 (1987). A significant factor in determining the impact of an improper comment on a jury verdict is whether "the comments were brief and isolated in the context of lengthy closing arguments." *People v. Runge*, 234 Ill. 2d 68, 142 (2009). In addition, we must presume, absent a showing to the contrary, that the jury followed the trial judge's instructions in reaching a verdict. *People v. Simms*, 192 Ill. 2d 348, 373 (2000). Finally, even if the State's closing remarks are improper, "they do not constitute reversible error unless they result in substantial prejudice to the

16

defendant such that absent those remarks the verdict would have been different." *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). Consistent with these holdings, our supreme court has recently clarified the appropriate standard of review on these issues: We will find reversible error *only* if defendant demonstrates that (1) the remarks were improper and (2) they were "so prejudicial that real justice was denied or the verdict resulted from the error." *People v. Jackson*, 2020 IL 124112, ¶ 83 (citing *Runge*, 234 Ill. 2d at 142).

¶ 50    In this case, defendant first claims that the State improperly implied that Glen had nothing to lose by confessing "because he was serving a long prison sentence." We note, however, that the State did not claim that Glen was serving a long prison sentence. Glen admitted he was in custody for another offense and that he had a prior felony conviction. The State merely argued that Glen had nothing to lose (*i.e.*, because he was already incarcerated) by falsely testifying that he and his best friend Nino (whose real name he did not know) committed the offense. This was a reasonable inference from the evidence in this case.

¶ 51    Next, defendant claims that the State wrongfully argued that witness recantations were the result of intimidation by defendant, even though there was no evidence of intimidation at trial. Notably, however, defendant explained his unwillingness to inculpate codefendant in his video recorded statement: "snitches get stitches," that is, that witnesses who come forward deserve violent reprisals. Darneshia's statement that she inquired about witness protection also supported the State's argument. In addition, defense counsel argued that it was police coercion that resulted in the prior inculpatory statements, so the State was entitled to respond. See *Hall*, 194 Ill. 2d at 346. Therefore, the State's comment that its trial witnesses recanted their prior inculpatory statements (their "snitching") due to fear of retribution ("stitches") was a reasonable inference from the evidence.

¶ 52     Defendant also complains that there was no evidence to support the State's closing argument that Glen's identification of "Nino" as the actual shooter was fabricated from a "90s movie and a slang term." The State's argument that Nino was fictitious is a reasonable inference from the evidence because at no point did any of the multiple witnesses (or even defendant) implicate an individual known as "Nino." In any event, we note that the circuit court instructed the jury to disregard any argument that was not based upon the evidence (or a reasonable inference therefrom), and defendant does not argue that the jury failed to follow the court's instructions. This weighs against defendant's claim. See *Simms*, 192 Ill. 2d at 373. We further observe that this comment was isolated within a rebuttal argument that spans over 20 pages of text, which further weakens defendant's contention of error. See *Runge*, 234 Ill. 2d at 142.

¶ 53     We also reject defendant's claim that the State's closing argument that other prosecutors were confident in the occurrence witnesses' pretrial statements "impermissibly vouched for the truthfulness of witnesses." Reading the closing argument in context, as we must (see *Cisewski*, 118 Ill. 2d at 175-76), the State was arguing to the jury that the prosecutors spoke to the witnesses alone to ensure that their statements were not the product of coercion and that they were otherwise treated properly by the police. This comment was also a direct response to defense counsel's argument that the police coerced or otherwise mistreated the witnesses to obtain inculpatory statements against defendant. Since the State may respond to comments that clearly invite a response (*Hall*, 194 Ill. at 346), defendant's claim of error on this point is unavailing.

¶ 54     Finally, defendant's argument that the cumulative impact of these purported errors warrants a new trial is unavailing because we have rejected each claimed error. See *People v. Perry*, 224 Ill. 2d 312, 356 (2007).

¶ 55    Moreover, even assuming, *arguendo*, that the State committed error, defendant's claim would fail under both the plain error doctrine and as an ineffective assistance of counsel claim. To begin, the first prong of the plain error doctrine does not apply because, contrary to defendant's assertion, the evidence was not close. Although several of the State's key occurrence witnesses recanted their prior inculpatory statements to prosecutors and the grand jury, those prior statements—which were admitted as substantive evidence—significantly outweighed their recantations and impeached their trial testimony. Defendant's video recorded interview with the police corroborated those prior statements. Defendant admitted that he was present at the liquor store and involved in the verbal altercation with the victim. Defendant further conceded that he hit the victim (albeit he claimed it was "only" once) and then held open the rear door to the building to enable codefendant to re-enter the otherwise locked building after shooting the victim. Thus, the first prong of the plain error doctrine is inapplicable.

¶ 56    Furthermore, the second prong of the plain error doctrine is not met  here because we do not consider the alleged errors in this case to be so serious that they "affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Herron*, 215 Ill. 2d at 187. The court instructed the jury, *inter alia*:  (1) to base its verdict only on the evidence (and reasonable inferences therefrom); (2) that the State had the burden to prove defendant guilty; and (3) when it could consider a prior inconsistent statement substantively. Defendant provides nothing to rebut the presumption that the jury followed the judge's instructions. See *Simms*, 192 Ill. 2d at 373. The second prong of the plain error doctrine is therefore inapplicable. See *People v. Glasper*, 234 Ill. 2d 173, 215 (2009) ("Even though the remark was improper, we do not find that the error was so serious that the second prong of the plain-error test is satisfied."). In addition, as noted above, the remarks that defendant challenges were isolated within the 22-page-long State rebuttal argument

(and without regard to the 26 pages comprising the State's initial closing argument), which weighs significantly in favor of the State. See *Runge*, 234 Ill. 2d at 142.

¶ 57 Defendant's claim of ineffective assistance of counsel also fails. In this case, defendant cannot show prejudice. As noted above, there was substantial evidence supporting the jury's guilty verdict. Defendant admitted he argued with the victim at the liquor store, and surveillance video of the liquor store confirmed defendant's—and not Glen's—presence. Defendant admitted later hitting the victim and then holding open the back door of the building so that codefendant, after fatally shooting the victim, could re-enter. Darneshia's, Glen's, Jackson's, and Little's prior statements, which were substantively admitted as evidence, corroborated these admissions. On these facts, even if defense counsel had objected to the challenged remarks by the State, there is no reasonable probability that the result of the proceeding would have been different. *Petrenko*, 237 Ill. 2d at 496-97; *Strickland*, 466 U.S. at 690, 694. Since defendant cannot establish both prongs of the *Strickland* test, his claim necessarily fails. *Clendenin*, 238 Ill. 2d at 317-18 (citing *Strickland*, 466 U.S. at 697).

¶ 58                                    Evidentiary Issues

¶ 59 Defendant second contention on appeal is that his trial counsel rendered ineffective assistance in two respects. First, defendant argues that trial counsel provided ineffective assistance by failing to publish portions of State's exhibit 143 in which (1) defendant said that he had "no problem" with "GD's" [Gangster Disciples] because his uncle was a GD and thus defendant had "GD's in his kin" and (2) the lead detective, Detective Egan, yelled and used vile language— including the "n-word"—while interrogating defendant. Second, defendant argues that counsel also rendered ineffective assistance for failing to object to Detective Egan's opinion as to defendant's truthfulness during defendant's interrogation.

20

¶ 60    As discussed above, a defendant establishes ineffective assistance of counsel where (1) counsel's performance was deficient and (2) the deficient performance resulted in prejudice. *Petrenko*, 237 Ill. 2d at 496 (citing *Strickland*, 466 U.S. at 687).  Performance is deficient when it is objectively unreasonable under prevailing professional norms, and prejudice occurs when there is a reasonable probability that, absent counsel's errors, the result of the proceeding would have been different. *Id.* at 496-97; *Strickland*, 466 U.S. at 690, 694.  Failure to meet either prong vitiates ineffective assistance claims. *Clendenin*, 238 Ill. 2d at 317-18 (citing *Strickland*, 466 U.S. at 697).

¶ 61    With respect to counsel's performance, "*Strickland*'s first prong sets a high bar." *Buck v. Davis*, 580 U.S. ——, ——, 137 S. Ct. 759, 775 (2017).  Counsel's performance meets constitutional requirements if it merely falls within the "wide range of professionally competent assistance." *Id.* (citing *Strickland*, 466 U.S. at 690).  To that end, matters of trial strategy typically do not support a claim of ineffective assistance of counsel unless counsel failed to conduct any meaningful adversarial testing. *People v. Patterson*, 217 Ill. 2d 407, 441 (2005).

¶ 62    Defendant first contends that counsel was ineffective for failing to introduce two pieces of evidence from defendant's custodial interview.  The first piece of evidence concerns defendant's admission that he had "GD's" (Gangster Disciples) in his "kin" because his uncle was a member of that rival gang, and therefore defendant had no motive to harm the victim, who was purportedly a member of the Gangster Disciples.  The second piece of evidence involves Egan's yelling and use of vile language, including the "n-word."

¶ 63    With respect to defendant's statements about having GD's in his kin, trial counsel's decision not to play that evidence falls within the wide range of professional conduct.  Defendant argues that the introduction of this evidence would have both weakened the State's theory that this was motivated by a desire to kill a rival gang member and bolstered the defense theory that the

statements were the product of police coercion. We disagree. As defendant observes, the defense theory at trial was to establish that defendant's incriminating statements resulted from police coercion. Introducing evidence that defendant came from a family of hardened gang members would have weakened the defense theory that defendant's will was overborne merely from the police officer's strong language. We further note that trial counsel thoroughly cross-examined the police officers, and evidence of their use of profanity was squarely before the jury. Since counsel's performance need only fall within a wide range of professionally competent assistance (*Buck*, 580 U.S. at —, 137 S. Ct. at 775) and matters of trial strategy typically do not support a claim of ineffective assistance of counsel unless counsel failed to conduct any meaningful adversarial testing (*Patterson*, 217 Ill. 2d at 441), defendant claim on this point is unavailing.

¶ 64    As to the second piece of evidence, defendant argues that Egan's yelling and use of vile language, including a racial epithet, would have "corroborated the witnesses['] claims that Egan or those under his supervision mistreated them during their own interrogations." The State responds that, although Egan's comment was "offensive and inexcusable," there was no prejudice.

¶ 65    In this case, the video recording of defendant's custodial interrogation on February 16, 2014, reveals that defendant had admitted hitting the victim but denied stomping on the victim despite other witnesses' claims to the contrary. Egan responds that "on the west side," "stomp" can mean hit as well as forcibly step on. Defendant counters that "stomp" does not mean hit. Egan then states to defendant, "See what happens when you hang with these west-side n*****?" On the next day, Egan taunted defendant, telling him to stop crying "like a little girl."

¶ 66    The record in this case, however, is replete with examples of Egan's abusive language, and Egan freely conceded that he used profanity with defendant and physically kicked the mat that defendant had been provided. The jury also heard a clip of defendant's interrogation in which

Egan tells defendant to stop crying like a "little baby" and a "little bitch." Since the jury was already well aware of Egan's behavior, there was no reasonable probability that this additional clip would have changed the result of defendant's trial. See *People v. Dupree*, 2018 IL 122307, ¶ 51 ("Trial counsel's performance cannot be considered deficient because of a failure to present cumulative evidence"). Defendant's contention is therefore without merit, as admission of Egan's statements would be cumulative.

¶ 67    In sum, while we agree with the State that counsel's failure to present Egan's patently offensive language does not—*in this case*—warrant a new trial, we note that under different underlying facts, such a failure could serve as the sole basis for a new trial or even outright reversal.

¶ 68    Defendant also contends that trial counsel rendered ineffective assistance for failing to object to Egan's statement that he did not believe defendant was being truthful when defendant denied involvement in the victim's murder "amounted to an expert opinion" that improperly swayed the jury.

¶ 69    It is generally improper for a witness to comment on the veracity of another witness's credibility. *People v. Munoz*, 398 Ill. App. 3d 455, 487 (2010) (citing *People v. Kokoraleis,* 132 Ill. 2d 235, 264 (1989)). A police officer may, however, recount the steps taken in a criminal investigation and describe the events leading up to a defendant's arrest, where such testimony is necessary and important to fully explain the State's case to the trier of fact. *Id.* (citing *People v. Simms*, 143 Ill. 2d 154, 174 (1991); *People v. Williams*, 233 Ill. App. 3d 1005, 1016-17 (1992)).

¶ 70    Here, Egan's testimony described the course of the investigation. Specifically, he continued to challenge defendant's denials because of multiple witness statements and video recordings that squarely implicated defendant. See *id.* at 487-89 (police officer's testimony that the defendant "never" told the truth was reversible error, but prior testimony that the officer

23

disbelieved the defendant's "prior versions of the offense" were arguably valid). Defense counsel is not ineffective for failing to make a fruitless argument. *People v. Crawford*, 2013 IL App (1st) 100310, ¶ 133 (citing *People v. Edwards*, 195 Ill. 2d 142, 165 (2001). Therefore, defendant's claim does not meet the first prong of *Strickland*.

¶ 71    Moreover, even if trial counsel's failure to object meets the first prong of *Strickland*, defendant cannot establish the second. As discussed above, defendant's conviction was supported by the testimony of numerous witnesses and defendant's own admissions. Therefore, even in the absence of this purported error, we cannot hold that there is a reasonable probability that the result of defendant's trial would have been different. We must therefore reject defendant's claim.

¶ 72                                        CONCLUSION

¶ 73    We affirm the judgment of the circuit court.

¶ 74    Affirmed.