2024 IL App (1st) 220566-U

Fourth Division
Filed November 27, 2024

No. 1-22-0566

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of Cook County |
| | ) | |
| v. | ) | No. 14 CR 04928 02 |
| | ) | |
| JEMAL ROSS, | ) | The Honorable Maria Kuriakos-Ciesil, |
| Defendant-Appellant, | ) ) | Judge, presiding. |

JUSTICE OCASIO delivered the judgment of the court.
Presiding Justice Rochford and Justice Lyle concurred in the judgment.

**ORDER**

¶ 1   *Held:*  The summary dismissal of the defendant's postconviction petition was affirmed where he was not arguably prejudiced by the alleged errors of trial counsel and appellate counsel.

¶ 2   Petitioner, Jemal Ross, appeals from the circuit court's order summarily dismissing his postconviction petition, which he filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)). For the following reasons, we affirm.

¶ 3                     I.  BACKGROUND

¶ 4   In 2014, Ross and a codefendant, James Dixon, were charged in a 17-count indictment in connection with the fatal shooting of Andre Hughes on February 13, 2014. Dixon and Ross were jointly charged with three counts of first-degree murder, all of which alleged that they "shot and

killed" Hughes. Count 1 alleged that they did so knowingly or intentionally, count 2 alleged that they did so knowing that their actions created a strong probability of death or great bodily harm, and count 3 alleged that they did so during the commission of the forcible felony offense of mob action. They were also jointly charged with two counts of mob action, but those charges were nol-prossed before trial. Dixon was named as the sole defendant in the remaining 12 counts, which all charged first-degree murder under various combinations of legal theories and allegations that Dixon carried or used a firearm during the offense.

¶ 5     Dixon and Ross were jointly tried before separate juries. Dixon's jury acquitted him, but Ross's jury found him guilty of first-degree murder, and he was sentenced to 38 years in prison. We affirmed his convictions and sentences on direct appeal. *People v. Ross*, 2020 IL App (1st) 172187-U.

¶ 6                              A.  Pretrial Motion to Suppress

¶ 7     Prior to trial, Ross filed a motion to suppress statements he made to the police about the charged murder. He alleged that his initial custodial statement to police was not recorded as required by statute, making that statement and all subsequent custodial statements presumptively inadmissible. See 725 ILCS 5/103-2.1 (West 2014).

¶ 8     At the ensuing hearing, Detective James Campell testified that, after an investigative alert was issued for Ross's arrest, he, along with his partner Detective Joe Marszalec, Sergeant Kevin Bruno, and two other Chicago police officers, was assigned to locate and arrest Ross on February 15, 2014. When they arrived at Ross's home and identified themselves as police officers, Ross ran into his home. The officers followed and were able to arrest Ross. Ross was handcuffed and not free to leave. Ross was placed in a vehicle with officers from the Eighth District. He was driven a short distance away and was then transferred to the vehicle driven by Detectives Campbell and Marszalec, who transported Ross to Area North.

¶ 9     During the car ride, Ross asked why he was under arrest. Detective Campbell told Ross that he could not answer any of his questions unless he provided him with his rights. Detective

Campbell then gave Ross the *Miranda* warnings. Ross waived his rights and agreed to talk to the detectives. Detectives Campbell and Marszalec explained why Ross was under arrest. Ross denied being at the scene of the crime and being involved. Detective Campbell testified that he summarized the conversation in the general progress reports (GPR), but the conversation was not electronically recorded. Detective Campbell did not include in the GPR that Ross had initiated the conversation.

¶ 10    Defense counsel showed Detective Campbell Chicago Police Department Special Order S04-03-01, which detailed the digital recording of interrogations. Detective Campbell testified that Ross "continuously asked questions," so he felt he needed to give Ross the *Miranda* warnings so he could entertain Ross's questions. He added that he wanted to get Ross back to the police station as quickly as possible in order to "put him under video surveillance."

¶ 11    On cross-examination, Detective Campbell testified that, after the shooting, the investigation identified Ross and Dixon as suspects. On February 15, 2014, Campbell and Marszalec arrested Ross at his south-side home. Due to a recent snowstorm, they were not able to park directly in front of the house, so, after being arrested, Ross was initially placed in an unmarked car used by other officers and then driven two blocks away to where the detectives' vehicle was parked.

¶ 12    Detective Campbell testified that the ride back to Area North took approximately half an hour. He sat in the back seat with Ross while Marszalec drove. During the car ride, Ross "was upset and crying" and he referred to himself in the third person. When he was told the reason for his arrest, Ross initially denied being at the murder scene. When the detectives told him that there were witnesses and video that placed him at or near the scene, Ross admitted that he had been there, and he told them that he watched Dixon shoot Hughes and that he was afraid that Dixon would shoot him, too. Once they arrived at Area North, Ross was placed in an interview room with video equipment. Detective Campbell testified the vehicle they used to transport Ross was not equipped with recording equipment. Detective Campbell further testified that some patrol vehicles

had recording equipment; however, none of the vehicles in the detective unit had it. Detective Campbell stated that it was not feasible to record Ross's statements during transit to Area North.

¶ 13    A videorecording of the interview with Ross at 12:17 a.m. on February 16, 2014, was played. The video showed Detectives Campbell, Marszalec, and Russell Egan. At the start of the interview, Campbell told Ross, "I need to advise you of your rights like I did in the car."

¶ 14    The court found that the detectives' conversation with Ross in the car did not "exceed the scope of that permitted under the law." It noted that section 103-2.1 was "clearly drafted to define specifically what does not constitute a place of detention." It also found that while Ross initiated the conversation, "it [was] not disputed that he was *Mirandized* under the law as required before being admonished to speak." Ultimately, finding that "the police action *** [was] not in contravention of the statutory provision or the constitution as it states," the court denied the motion to suppress.

¶ 15                                B.  Trial Evidence

¶ 16    At trial, Chicago police officer David Watson testified that, at around 9 p.m. on February 13, 2014, he and his partner received a call of shots fired in the 300 block of North Central Avenue. When they arrived at the alley behind the building located at 312 North Central Avenue, Watson saw a Black male lying motionless in blood-spattered snow with spent shell casings nearby. Watson called out to bystanders asking if anyone could explain what happened. They only response he heard was, "They f***ed him up." Watson testified that no one was forthcoming or cooperative, no one explained what transpired, and no one provided their names or contact numbers.

¶ 17    Chicago police detective John Valkner testified he arrived at the scene at around 9:15 p.m. and began canvassing the building. He learned that a woman in apartment 107, Darneshia Grissett, had borrowed a bucket from her neighbor across the hall. Darneshia[1] allowed police to search her residence, and police recovered a mop with apparent blood on it and a bucket. Darneshia agreed to go to the police station for questioning.

---

[1]    For clarity, we refer to Darneshia Grissett and her son Glen Grissett using their first names.

¶ 18      At the police station, Darneshia identified Allen Ford (whom she also knew as "Awall") and Dixon (whom she also knew as "Shorty Drill" and "Lil James") as individuals who were "stomping" on Hughes. Darneshia stated that Dixon held a door open while Ford dragged the victim out of the building. Valkner interviewed Darneshia a second time after viewing surveillance footage of the building and speaking with other witnesses. During the interview, Darneshia admitted it was Ross (whom she also knew as "Bolo") who was kicking, "stomping," and punching Hughes.

¶ 19      Detective Valkner further testified that Jesse Little identified Ross and Dixon as the individuals who beat, punched, and stomped on Hughes. Valkner added that Little and Terrell Jackson both identified Ross at a physical line-up as one of the men who beat the victim in the hallway. Little said that Glen Grissett was also present during the beating of Hughes and identified Glen in a photo array.

¶ 20      Detective Campbell testified that he interviewed Glen around 2 a.m. on February 14, 2014. Campbell stated that Glen identified Ross and Dixon as the individual who were "beating and stomping" on the victim. Glen also identified Dixon as the individual who "pulled out a gun in [the] hallway."

¶ 21      Detective Campbell arrested Ross at around 11 p.m. on February 15, 2014. Campbell and his partner, Detective Marszalec, took Ross to the police station for questioning. Detective Campbell sat in the back seat with Ross, while Detective Marszalec drove. Detective Campbell testified that Ross was very upset and kept asking why he was under arrest. Detective Campbell advised Ross of his *Miranda* rights and informed him they were investigating the murder of Hughes. When Ross claimed he was not present at the time of the offense, Detective Campbell told Ross that there were witnesses and a video recording refuting that. Ross eventually admitted he was there but said that he was afraid of Dixon. Ross was standing at the back door of the building keeping it open so that the door would not close. When they arrived at the station, Ross was placed in an interview room and his interview was recorded. Detective Campbell testified that

he obtained a video recording of the surveillance camera at Prestige Liquors, which "showed the defendant and the victim in the liquor store."

¶ 22   On cross-examination, Detective Campbell testified that, during the ride to the police station, Ross never said either that he dragged Hughes down the hallway or that he punched the victim.

¶ 23   Chicago police detective Vincent Alonzo testified that, on February 16, 2014, he interviewed Jackson, also known as "T-Baby," at the police station. Jackson admitted "hearing a ruckus" and seeing the victim fall down the stairs to the floor. Jackson identified Ross in a photo array and in a lineup as the individual who kicked and punched the victim. Detective Alonzo further testified that Jackson did not indicate that Glen was present at the time of the offense.

¶ 24   Sergeant Egan, who was the lead detective, testified that, although Darneshia initially stated that Dixon and Ford beat the victim in the hallway, she later said that it was Dixon and Ross who beat the victim in the hallway outside of her apartment and then dragged him down the hallway. According to Egan, Darniesha lied during her first interview because she had been "intimate" with Ross and was lying to protect him.

¶ 25   Egan further testified that both Glen and Jackson identified Ross as beating the victim in the hallway and that Demetrius Haymon identified Ross and Dixon in a photo array and wrote "hitting vict [*sic*] on each photograph. Little also identified Ross and Dixon as the individuals who were at Prestige Liquors and who beat the victim. Egan confirmed that Glen stated that Dixon took out a chrome handgun in his right hand before putting it back and dragging the victim down the hallway with Ross.

¶ 26   Portions of the DVD recording of Ross's interview were played for the jury. During the recording, Ross admitted to hitting the victim "one time" but denied stomping on or dragging the victim. Ross was reluctant to describe what happened because "snitches get stitches," which Ross explained meant that people which provide information to the police frequently suffer violent reprisals.

¶ 27    On redirect examination, Egan agreed that when he was questioning Ross, he was aware that four witnesses—Glen, Darneshia, Jackson, and Little—said that they saw Ross beating, kicking, stomping, and then dragging the defendant.

¶ 28    Cook County Assistant State's Attorney Suzi Collins testified that she interviewed and took recorded statements from Glen, Darneshia, and Little. Their video-recorded statements were played for the jury. During their respective statements, Darneshia said that she was "pretty sure" that Ross and Dixon were members of the Four Corner Hustlers gang, Glen stated that Ross and Dixon were members of the Four Corner Hustlers, and Little stated Ross was a member of the Four Corner Hustlers.

¶ 29    According to Little's statement, on the day of the shooting, he went to Prestige Liquors with Ross. While they were there, Little heard Hughes say "something" about the Ganster Disciples gang. Ross took Hughes's statement personally and told Hughes to "take that GD [Gangster Disciples] sh*** back" to where he came from. When he and Ross returned to the building, Ross told others in the hallway what Hughes had said.

¶ 30    Glen, like Little, recalled that Ross heard Hughes say "F*** the Fours" at the liquor store. Glen also said that Dixon and Ross stopped Hughes on the stairs, and Glen saw Dixon with a gun.

¶ 31    Darneshia and Little saw Ross and Dixon stomping on Hughes. Little added that they were punching Hughes. Darneshia said she saw Ross dragging Hughes toward the back door. Glen stated that Dixon punched Hughes, Ross kicked Hughes repeatedly in the head, and both Ross and Dixon dragged Hughes to the back door. Glen and Little both then left and heard gunshots coming from the back of the building.

¶ 32    Darneshia and Glen both stated that the police had not threatened them or promised them anything to induce their statements. Little stated he was not under the influence of drugs of alcohol on the night of the murder.

¶ 33    Cook County Assistant State's Attorney Patrick Waller testified that he took the written statement of Demetrius Haymon. Waller had learned "early on" that Haymon was a minor, and Waller discussed "the situation with his Mom not being there." Haymon used his cell phone to call

his mother. Waller spoke to Haymon's mother and explained "what was going on at the police station," and asked for her permission to take Haymon's written statement.

¶ 34     Haymon's statement was published to the jury. In his statement, Haymon indicated that he witnessed a fight that started after words were exchanged between Ross, Dixon, and Hughes (whom Haymon did not know). Both Ross and Dixon were members of the Four Corner Hustlers and Hughes insulted the Four Corner Hustlers. Haymon saw someone throw Hughes to the ground, and various people, including Ross, started punching and kicking him. Hughes did not fight back and was "very badly" beaten. Once the beating stopped, Ross dragged Hughes away. Haymon also stated he gave his statement freely and voluntarily.

¶ 35     Cook County Assistant State's Attorney Anastasia Harper testified that she took the grand jury testimony of Glen, Darneshia, Jackson, and Little. The transcripts of Glen's, Darneshia's, and Little's grand jury testimony were published to the jury, and their statements were substantially the same as their statements to the assistant state's attorneys.

¶ 36     At trial, Darneshia, Glen, Little, Jackson, and Haymon all recanted their prior statements inculpating Ross. They all denied or could not recall seeing Ross beat and then drag Hughes down the hallway. Darneshia initially testified that she saw Ross, Dixon, and others stomping on Hughes. She also saw Ross and Dixon drag Hughes to the back exit of the building. Later, Darneshia testified that she did not see Ross stomping or dragging Hughes. She also testified that she did not see anything that she earlier testified to. On cross-examination, Darneshia testified that she saw her son, Glen, stomping on the victim but did not tell the police because she was trying to protect "everybody." When asked whether she protected Ross because he was her boyfriend, Darneshia responded, "Yeah." When asked if she "protected Glen mostly because he is your son," Darneshia responded, "Not really."

¶ 37     Glen testified that, at the time of the offense, he was in the building with his friend "Nino." Glen testified he and Nino beat Hughes and dragged him outside, where Nino shot Hughes. Glen testified he did not tell Collins about Nino shooting Hughes because Nino was his best friend. Additionally, he implicated Ross because he was upset that Ross was dating his mother, Darneshia.

Glen also testified that the testimony of the police officers, the video recordings of his statements to Collins, and his grand jury testimony transcript were correct; however, he denied the veracity of those statements.

¶ 38     Little testified that he did not recall seeing Ross or Dixon on the night of Hughes's murder, nor did he remember the events leading up to the murder. He added that he did not know the names of either Ross or Dixon.

¶ 39     Jackson testified that he only agreed to view a lineup because the police "badgered" him, used "very vulgar" language with him, and threatened him, including by informing him that the police would "put [him] into the case." Jackson added that a detective called him a "bitch," tried to put his hands on him, and kicked "stuff" around. He also testified that he did not know Ross's real name until the police informed him of it at the lineup.

¶ 40     Haymon admitted writing "hitting vict" on a picture of Dixon and Ross but explained that, although he kept telling the police that he was not there, the police kept "yelling at him," so he told them "anything" because he "just wanted to get out of there."

¶ 41                         C.  Testimony of Diamond Miller

¶ 42     Miller was called as a witness for Dixon. The court initially advised the jurors that her testimony applied to both defendants. Before she testified, the State requested a sidebar, where it informed the court that Cook County Jail records showed that Miller had made several visits to Ross and that the State intended to ask questions during cross-examination about the visits. The court asked defense counsels their thoughts on the matter. Ross's attorney requested that his jury be excluded during Miller's testimony and stated, "[I]f we're going to recall—we'll recall her in our case in defense."

¶ 43     After Ross's jury was sent home for the day, Miller testified that, in February 2014, she lived at 312 North Central with Jackson. On February 13, 2014, Miller returned home around 8:30 p.m. and Jackson was at the apartment. After speaking with Jackson, Miller went across the hall to Darneshia's apartment. Miller met with Darneshia outside of Darneshia's apartment. Miller

testified Darneshia "was acting emotional" and was shaking and crying. Miller saw a silver gun in Darneshia's hand and a mop bucket beside her door. Miller returned to her apartment after speaking with Darneshia. Later that evening, the police came and spoke with Miller and Jackson. Miller told the police she "didn't see nothing."

¶ 44    During cross-examination, Miller testified that she did not know Ross or Dixon at the time but had "seen them around sometimes." Miller testified that she had visited Ross in Cook County Jail a number of times since February 13, 2014. She explained that they "got acquainted" after the shooting because she found out that she knew his mother. As to the incident itself, Miller testified that she never saw Darneshia mopping up blood and that she only saw a mop and a bucket inside Darneshia's apartment. When Miller went to Darneshia's apartment, Darneshia did not have a gun in her hand, but Darneshia showed her a gun within three minutes of Miller being in the apartment. Miller testified that she did not know where Darneshia got the gun from. The police knocked on Miller's door about 10 to 15 minutes after she returned home and asked her if she heard any gunshots. Because she had not been there, she told them that she had not heard any shots. She admitted that she did not tell the police that Darneshia had just shown her a gun. She also admitted that, when she spoke with investigators from the state's attorney's office, she told them that she did not know what happened that night because she was not there, and she did not tell them that she saw Darneshia with a gun.

¶ 45                              D.  Jury Instructions and Verdict

¶ 46    Without objection, the court instructed the jury on the principles of accountability using the pattern instruction. See Illinois Pattern Jury Instructions, Criminal, No. 5.03 (approved Oct. 28, 2016). The State also asked the court to give the following instruction, which was based on Illinois Pattern Jury Instructions, Criminal, No. 5.03A (approved Oct. 28, 2016) (IPI Criminal 5.03A):

> "To sustain the charge of first degree murder, it is not necessary for
>
> the State to show that it was or may have been the original intent of the

defendant or one for whose conduct he is legally responsible to kill the deceased, Andre Hughes.

It is sufficient if the jury believes from the evidence beyond a reasonable doubt that the defendant and one for whose conduct he is legally responsible combined to do an unlawful act, such as to commit mob action, and that the deceased was killed by one of the parties committing that unlawful act."

Ross objected to this instruction on the basis that "the purported mob action was inherent in the murder." Based on the evidence presented at trial, which showed that Hughes was dragged outside to the alley after "the situation involving greater numbers within the building," the court found that the mob action was not inherent in the murder and, therefore, gave IPI Criminal 5.03A over the objection.

¶ 47    The trial court's instructions did not require the jury to deliberate separately as to each theory of first degree murder charged in the indictment, and it gave the jury only a single set of verdict forms calling for a general verdict of guilty or not guilty of first-degree murder. Ross did not object or ask the court to use separate verdict forms.

¶ 48    The jury found Ross guilty of first-degree murder and that he was armed with a firearm during the commission of the offense. Ross was sentenced to 38 years' imprisonment.

¶ 49                                E.  Direct Appeal

¶ 50    On direct appeal, Ross, who was represented by appointed counsel, did not raise any issues related to the unsuccessful motion to suppress or Diamond Miller's testimony in Dixon's trial. Instead, he argued that the State had made a series of improper remarks during closing argument and that he had been denied the effective assistance of counsel by trial counsel's failure to publish various portions of his lengthy video-recorded statement or object to an allegedly improper opinion that Detective Egan had offered about Ross's truthfulness during the interrogation. Finding no error, we affirmed Ross's conviction. *Ross*, 2020 IL App (1st) 172187-U, ¶¶ 44-74.

¶ 51                              F.  Postconviction Proceedings

¶ 52    Ross, through private counsel, filed his postconviction petition on December 14, 2021. The petition alleged that trial counsel was ineffective for failing to request separate verdict forms, failing to object to the felony murder mental state instruction that would not apply to the intentional and knowing murder theories, and failing to call Miller as a witness. It alleged that appellate counsel was ineffective for not raising those issues on direct appeal and for not challenging the denial of the motion to suppress.

¶ 53    On March 14, 2022, the circuit court summarily dismissed Ross's postconviction petition as frivolous and patently without merit. This appeal timely followed.

¶ 54                              II.  ANALYSIS

¶ 55    The Act provides a mechanism for a criminal defendant to raise a claim that they were substantially deprived of a right under the United States Constitution or the Illinois Constitution. 725 ILCS 5/122(1) (West 2020). The Act provides for up to three stages to adjudicate claims. *People v. Boclair*, 202 Ill. 2d 89, 99 (2002). At the first stage, a postconviction petition is examined by the circuit court to determine whether it "is frivolous or is patently without merit." 725 ILCS 5/22-2.1(a)(2) (West 2020). A claim is frivolous or patently without merit if it has no arguable basis in law or fact. *People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009). A petition lacks an arguable basis in law or in fact when it is "based on an indisputably meritless legal theory or a fanciful factual allegation." *Id*. at 16. To avoid summary dismissal, a postconviction petition must set forth enough facts to make a "gist" of a constitutional claim. *Hodges*, 234 Ill. 2d at 9. We review the summary dismissal of a postconviction petition *de novo*. *People v. Tate*, 2012 IL 112214, ¶10.

¶ 56                    A.  Ineffective Assistance of Trial Counsel

¶ 57    To establish a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness, and (2) a reasonable probability exists that but for counsel's deficient performance, the result would have been different. *Stickland v. Washington*, 466 U.S. 668, 687 (1984). Both prongs of *Strickland* must be satisfied to succeed on a claim of ineffective assistance of counsel. *People v. Flores*, 153 Ill. 2d 264, 283

(1992). At the first stage of a postconviction proceedings, a defendant must only show that it is arguable that trial counsel's performance fell below an objective standard of reasonableness, and it is arguable that defendant was prejudiced by such deficient performance. *Tate*, 2012 IL 112214, ¶ 19.

¶ 58    Before proceeding, we briefly address the State's arguments that counsel's alleged errors were reasonable strategic decisions. It is true that, to prove his ineffective-assistance claim, Ross would have to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland*, 466 U.S. at 690 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). At the summary-dismissal stage of postconviction proceedings, however, Ross does not need to prove his claim, he only needs to show that counsel's performance was *arguably* deficient. See *Tate*, 2012 IL 112214, ¶¶ 19-20. Strategic justifications for counsel's alleged errors are generally more appropriately raised and resolved at later stages. See *id.* ¶ 22 (finding the strategy arguments raised by the State "inappropriate for the first stage"). For that reason, we decline to affirm on the basis of the strategic justifications proposed by the State on appeal.

¶ 59    We also note that the State argues that Ross forfeited these claims by not raising them on direct appeal. However, Ross argues that any forfeiture was the result of the ineffective assistance of appellate counsel, which avoids the forfeiture bar. See *People v. Delgado*, 2022 IL App (2d) 210008, ¶ 24 (citing *People v. Turner*, 187 Ill. 2d 406, 413 (1999). We therefore address the arguable merits of Ross's claims.

¶ 60                    1.  Jury Instructions and General Verdict Forms

¶ 61    Ross first claims that he was deprived his right to the effective assistance of counsel because trial counsel (1) did not ask the court to provide the jury with separate sets of verdict forms reflecting the different theories of first-degree murder charged in the indictment and (2) did not object to the use of Illinois Pattern Jury Instructions, Criminal, No. 5.03A (approved Oct. 28, 2016) (IPI Criminal 5.03A), which clarifies the mental state necessary to prove felony murder under a

theory of accountability. Both of these claims fundamentally misunderstand how first-degree murder works under Illinois law.

¶ 62    The statute defining first-degree murder sets out three ways in which someone can commit that offense:

> "A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:
>
> (1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or
>
> (2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another; or
>
> (3) he is attempting or committing a forcible felony other than second degree murder." 720 ILCS 5/9-1(a) (West 2014).

Here, Ross was charged with first-degree murder under each of these theories. He argues that using a general verdict form rather than separate theory-specific verdict forms made it possible for the jury find him guilty even if the individual jurors did not unanimously agree as to which of the three theories had been proven beyond a reasonable doubt. We agree, but that was entirely proper. It is settled that first-degree murder is only "one offense" and that the three "different theories embodied in the murder statute are merely different ways to commit the same offense." *People v. Coats*, 2018 IL 121926, ¶ 22. Thus, a jury can properly find the defendant guilty of first-degree murder even if its members do not unanimously agree that a specific theory has been proven beyond a reasonable doubt. *People v. Smith*, 233 Ill. 2d 1, 17 (2009). A general verdict form is, therefore, constitutionally sufficient. *Id.* at 14. Separate verdict forms are only necessary if the specific theory relied upon by the jury makes a legal difference for some other reason; it might, for instance, have consequences for sentencing. *Id.* at 23.

¶ 63    Ross has not identified any reason why separate verdict forms were necessary here other than to avoid the legally irrelevant risk that the jury might not all agree on the theory under which

the State proved him guilty. Unlike cases in which the defendant's state of mind might affect eligibility for the death penalty or a mandatory life sentence, the sentencing range here would be the same under all three theories charged in the indictment. See *People v. Bailey*, 2013 IL 113690, ¶¶ 55-58. Because the State nol-prossed the mob action charges, there was no risk that Ross would be improperly sentenced to serve sentences for both felony murder and for the underlying felony. See *id.* ¶ 58 ("[T]he application of *Smith* in future cases would seem to be limited to the question of consecutive or concurrent sentencing for charged predicate felonies."). Ross did not ask for an instruction on second-degree murder, a mitigated offense that is only available when the defendant has been convicted of either intentional or knowing murder, making separate verdict forms necessary when the State also charges felony murder. See *People v. Payton*, 356 Ill. App. 3d 674, 678-86 (2005). Accordingly, we do not see an arguable basis for requesting unnecessary—and potentially confusing—separate verdict forms.

¶ 64    Ross's argument that counsel should have objected to IPI Criminal 5.03A rests on the same flawed assumption that the jurors must unanimously agree on which theory of first-degree murder has been proven beyond a reasonable doubt. As given by the trial court, that instruction stated:

> "To sustain the charge of first degree murder, it is not necessary for the State to show that it was or may have been the original intent of the defendant or one for whose conduct he is legally responsible to kill the deceased, Andre Hughes.
>
> It is sufficient if the jury believes from the evidence beyond a reasonable doubt that the defendant and one for whose conduct he is legally responsible combined to do an unlawful act, such as to commit mob action, and that the deceased was killed by one of the parties committing that unlawful act."

Ross argues that this instruction was only applicable to felony murder and misstated the law governing the other two theories charged. But again, the State was not required to prove any particular theory beyond a reasonable doubt to all of the jurors. It only needed to prove to each

juror beyond a reasonable doubt that Ross had committed first-degree murder under *one* of the charged theories. Hence, the instruction correctly stated the law: if the State proved that Hughes was killed during the commission of an unlawful act for which Ross was legally accountable, it did not have to prove that Ross or anybody else intended to kill the victim.

¶ 65    As neither the use of a general verdict form nor the giving of IPI Criminal 5.03A was erroneous, counsel's alleged errors did not arguably amount to ineffective assistance. Because IPI Criminal 5.03A accurately stated the law, any objection to it would have been overruled as meritless, so counsel's failure to object was neither arguably deficient nor arguably prejudicial. See *People v. Rodriguez*, 2014 IL App (2d) 130148, ¶¶ 88-89. Similarly, because there was no legal basis for requesting separate verdict forms for each distinct theory of first-degree murder charge, the court would have denied a request for separate verdict forms, so counsel's failure to ask for separate forms was not arguably deficient or prejudicial.

¶ 66                     2.  Failure to Call Diamond Miller

¶ 67    Ross also claims that trial counsel was ineffective for failing to call Diamond Miller as a witness. He argues that Miller's testimony would have corroborated the theory that Glen and Nino beat Hughes and that his statements were the subject of police coercion. During trial, Glen testified he and Nino beat and killed Hughes. Glen also testified he did not tell Collins that Nino had shot Hughes because Nino was his best friend. Additionally, Glen stated he implicated Ross because he was upset Ross was dating his mother. Glen also testified the testimony of the police officers, the video recording of his statement, and the transcript of his grand jury testimony were accurate. That evidence all showed that Glen had previously stated Ross was involved with the murder of Hughes.

¶ 68    We discern no arguable prejudice because we do not see how Miller's testimony could have possibly made a difference to the verdict. Miller testified that she was not home at the time of the beating and death of Hughes. Miller testified Darneshia was emotional, she had a gun, and Miller observed a mop and bucket inside her apartment. Additionally, Miller testified she did not know

Ross. Nothing in Miller's testimony exculpated Ross. Therefore, we find Ross was not arguably prejudiced by counsel's failure to call Miller as a witness at trial.

¶ 69                          B.  Ineffective Assistance of Appellate Counsel

¶ 70    Ross next argues that he was denied the effective assistance of counsel on direct appeal. The two-pronged *Strickland* test applies to allegations of ineffective assistance of appellate counsel. *People v. Caballero*, 126 Ill. 2d 248, 269-70 (1989). "With respect to appellate counsel's failure to raise an issue, a defendant meets the prejudice prong by showing a reasonable probability that, had counsel raised the issue, the appeal would have succeeded." *People v. Shipp*, 2015 IL App (2d) 130587, ¶ 24. "A 'reasonable probability' is defined as 'a probability sufficient to undermine confidence in the outcome.' " *People v. Simpson*, 2015 IL 116512, ¶35 (quoting *Strickland*, 466 U.S. at 694). Thus, we must examine the merits of Ross's underlying claims to determine whether he was arguably prejudiced by appellate counsel's failure to raise it on direct appeal. *People v. Simms*, 192 Ill. 2d 348, 362 (2000); see *Tate*, 2012 IL 112214, ¶ 19.

¶ 71    Ross contends that, had appellate counsel raised the issue of the circuit court's failure to grant his motion to suppress statements, there was a reasonable likelihood that the issue would have succeeded on direct appeal. Ross argues that "the statute appears to be broadly worded" and "any 'place of detention *** ' will suffice," including a locked police vehicle.

¶ 72    When interpreting a statute, the ultimate goal is "to ascertain and give effect to the true intent of the legislature." *People v. Clark*, 2019 IL 122891, ¶ 17. If the statutory language is clear and unambiguous, it must be applied without resorting to other aids of statutory construction. *Bettis v. Marsaglia*, 2014 IL 117050, ¶ 13. The court cannot depart from the plain language of the statute by reading into it exceptions, limitations, or conditions that are not consistent with the express legislative intent. *Id*. When determining the legislature's intent, "the court should consider, in addition to the statutory language, the reason for the law, the problems to be remedied, and the objects and purposes sought." *People v. Smith*, 345 Ill. App. 3d. 179, 185 (2004).

¶ 73    Section 103-2.1(b) of the Code of Criminal Procedure of 1963, which addresses statements made during murder investigations, provides that any "statement of an accused made as a result of a custodial interrogation conducted at a police station or other place of detention" is presumptively inadmissible unless it is electronically recorded. 725 ILCS 5/103-2.1(b) (West 2014). The statute specifically defines what a "place of detention" is:

> "In this Section, 'place of detention' means a building or a police station that is a place of operation for a municipal police department or county sheriff department or other law enforcement agency, not a courthouse, that is owned or operated by a law enforcement agency at which persons are or may be held in detention in connection with criminal charges against those persons." *Id.* § 103-2.1(a).

By the plain terms of this definition, a "place of detention" must be either "a building or a police station." A car, of course, is neither a building nor a police station, so this statute plainly does not govern the interrogation that happened during the ride to Area North. Ross argues that this interpretation "is excessively narrow, absurd in its outcome, and undermines the intention of the legislature in requiring custodial interrogations be recorded." Sound or not, these policy arguments simply cannot defeat the actual definition set out in the statute. We cannot see how it could be even arguably unreasonable for appellate counsel to refrain from arguing that the detectives' car was, in fact, a building. And if counsel had advanced that position on direct appeal, it would not have arguably stood a reasonable chance of success. Either way, appellate counsel did not arguably provide ineffective assistance.

¶ 74    Regarding Ross's other claims for ineffective assistance of appellate counsel, because his claims of ineffective assistance of trial counsel are without arguable merit as discussed above, it is not arguable that he was prejudiced by the failure to raise those inarguably meritless claims on appeal. See *People v. Dixon*, 2022 IL App (1st) 200162, ¶ 32 (noting that the failure to raise an issue on appeal is only prejudicial if the underlying issue is meritorious).

¶ 75                                III. CONCLUSION

¶ 76     For the foregoing reasons, we agree with the circuit court that Ross's postconviction petition lacked an arguable basis in law and fact, so we affirm the circuit court's judgment summarily dismissing it.

¶ 77     Affirmed.